HAQUE TRAVEL AGENCY, INC.
and Shamsul M. Haque, M.D.,
Plaintiffs,

v.

TRAVEL AGENTS INTERNATIONAL,
INC., Defendant.

No. 91–73345.

United States District Court,
E.D. Michigan, S.D.

Dec. 17, 1992.

Brian H. Herschfus, Farmington Hills, MI, for plaintiffs.

John C. Cashen, Troy, MI, for defendant.

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GADOLA, District Judge.

Defendant filed this motion for summary judgment October 5, 1992. On October 28,

1992, plaintiffs filed their response. Defendants filed a reply November 9, 1992.

### I. Facts

The facts surrounding this case are not in dispute.[1] In or about November 1988, plaintiff Dr. Shamsul M. Haque ("Haque"), a practicing doctor of psychiatry, contacted defendant Travel Agents International, Inc. ("TAI") to discuss the possibility of Haque's purchasing and establishing in the Detroit area a TAI franchise travel agency. In November 1988, Haque met with a representative of TAI, Gabe Ferrera.

At the November 1988 meeting, Haque and Ferrera discussed Haque's goals in making the investment. Haque was planning to retire in 1990 or 1991. He was looking to invest in a business that he could run as an absentee owner until such time as he retired when he would become more actively involved in the business.

After initial discussions were had between Haque and Ferrera, Haque invited Saif Imam ("Imam") to join him at the next meeting. Imam is a close friend of Haque who had recently expressed some dissatisfaction with his employment as controller of a real estate services company. Haque and Imam discussed with Ferrera their plan that Imam would work part-time, that is, in the evenings and on weekends, overseeing the travel agency business until such time as the travel agency became profitable enough that Imam could be paid from its profits commensurately with the salary and benefits he was presently earning in his job with the real estate association.

Haque and Imam raised four specific concerns with Ferrera: (1) Could the travel agency be operated on an absentee ownership basis?; (2) How much would the total investment of capital be?; (3) What kind of return could Haque expect on his capital investment?; and (4) What role would TAI play in the operation of the franchise once it was purchased by Haque.[2] Ferrera provided answers to all of these concerns.

As to absentee ownership, Ferrera indicated to Haque and Imam that the agency could be successfully operated on an absentee basis provided the agency hired one full-time manager. Ferrera assured Haque and Imam that their plan of limited-involvement could be successful. Pursuant to these discussions as to the day-to-day running of the agency, Imam developed a three-year financial forecast for the agency which he presented to Ferrera for review.[3] The first year of the three-year forecast provided for outflows of $18,000.00 to pay the salary of a full-time manager and $7,000.00 to pay a part-time sales representative.

As to total investment, Ferrera indicated such would be "about $85,000.00." Haque Dep. at 91. Haque testified that in his own mind, he believed he should be "prepared for at least $100,000, because salespeople, normally they'll try to sell you something, but—so, you know, I'm basically conservative." Haque Dep. at 65. From March 1989, when Haque signed the franchise agreement, to April 1992, Haque had invested approximately $242,900.00. Haque has testified, "I don't know that [Ferrera] knew or not [that the total investment ultimately would be more than $85,000.00]. My position is that he should have known before he spoke." Haque Dep. at 92.

As to expected return on Haque's investment, Ferrera stated that he thought that within twelve to eighteen months the agency would break even or otherwise "turnaround."[4] Haque Dep. at 106. Ferrera

---

1. As plaintiffs state in their response brief at page 9, "Defendant's defense in this lawsuit is *not* that it disagrees with Plaintiff of [sic] what representations were made by Defendant or its agents, but rather Defendant defends on the basis that its Franchise Agreement (Exhibit G) provides that the Franchisor (TAI) disassociates itself from oral representations made by TAI or its agents who are not an "officer" [sic] of TAI."

2. Imam invested no capital into the franchise business. His sole contribution was to be in overseeing the day-to-day operations of the business.

3. Ferrera provided Imam with "ballpark figures" on the cost of "computer lease and software lease." Dep. of Imam at 66.

4. Haque testified, "All I recall is that I asked him, 'When do you think we will be able to turn

further stated that a travel agency the size of that which Haque and Imam were planning to operate could expect "after it becomes established," to bring in gross sales of $3 million and, at the industry commission rate of 10 percent, gross income of $300,000.00. Plaintiff's Resp. at 5.

Finally, as to franchisor support, Ferrera indicated that TAI would provide substantial aid and instruction, including operational support to the franchise and its employees; that TAI had established an ad council through which Haque's travel agency would be able to advertise; and that TAI would help locate and negotiate the terms of office space. Haque admits that TAI gave substantial aid to Haque in running the agency but claims that such efforts fell short of what he and Imam expected. Plaintiffs' Resp. at 7–9.

On June 7, 1991, plaintiffs Haque, Haque Travel Agency, Inc. and Saif Imam filed a complaint in Oakland County Circuit Court, alleging two counts: "intentional fraud" and "intentional infliction of emotional distress." On July 9, 1991, defendant filed a notice of removal to federal court which properly alleged diversity jurisdiction pursuant to 28 U.S.C. § 1332. On July 20, 1992, plaintiff Imam was voluntarily dismissed as a party to this action.

## II. Standard of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881

(6th ed. 1979)) (citation omitted). The Court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir.1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986). The initial burden on the movant is not as formidable as some decisions have indicated. The moving party need not produce evidence showing the absence of a genuine issue of material fact; rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg*, 801 F.2d at 861.

To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986),

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted); *see also Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Fed.

around?' and he said, '12 to 18 months.'" Haque Dep. at 106.

R.Civ.P. 50(a). *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Consequently, a nonmovant must do more than raise some doubt as to the existence of a fact; the nonmovant must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transp. Serv., Inc.,* 738 F.Supp. 214, 217 (E.D.Mich.1990), *aff'd,* 929 F.2d 701 (6th Cir.1991). The evidence itself need not be the sort admissible at trial. *Ashbrook v. Block,* 917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than the nonmovant's own pleadings and affidavits. *Id.*

### III. Analysis

■■■ When jurisdiction is based on diversity of citizenship, as it is in this case, a federal court must apply the choice of law rules of the state in which it sits. *Mahne v. Ford Motor Co.,* 900 F.2d 83, 85 (6th Cir.1990). Thus, the choice of law rules of Michigan govern in this case. Michigan adopts the rule of *lex fori;* that is, the rule that the law of the forum is presumed to apply unless there is a rational reason why another state's law should supersede the law of the forum state. *Id.* at 86, *citing Olmstead v. Anderson,* 428 Mich. 1, 24, 400 N.W.2d 292 (1987). As the law of the forum and the law of the state in which all of the transactions alleged in this case took place, Michigan law applies.

Plaintiffs admit that there is no dispute as to any material fact in this case. Plaintiff's resp. at 9. Thus, the issue before this court is whether the law as it applies to the facts in this case, can support plaintiffs' claims for fraud and intentional infliction of emotional distress. For the following reasons, the court finds that it does not and therefore that defendants' motion for summary judgment should be granted.

■■■ To establish fraud, the statements alleged to be false must relate to past or existing facts, and not to a future promise or expectation. *Webb v. Malmquist,* 195 Mich.App. 470, 491 N.W.2d 851

(1992); *Van Tassel v. McDonald Corp.,* 159 Mich.App. 745, 752, 407 N.W.2d 6 (1987); *Hi–Way Motor Co. v. Int'l Harvester Co.,* 398 Mich. 330, 336, 247 N.W.2d 813 (1976). The only exception to this rule is where the future promise was made in bad faith, that is, without a present intent to perform. *Hi–Way,* 398 Mich. at 336, 247 N.W.2d 813.

■■■ Plaintiffs claim that Ferrera, the agent of defendant TAI, made representations to plaintiffs that (1) the travel agency could be operated on an absentee ownership basis; (2) the total investment of capital necessary would be about $85,000.00 and that the agency would "turnaround" within twelve to eighteen months; (3) the agency's gross profit once the business was established would be approximately $300,000.00; and (4) that TAI would play a substantial role in the operation of the franchise once it was purchased by Haque. Plaintiffs allege that all these representations subsequently proved false.

All of the representations made by defendant's representative relate to predictions of future profitability and success. Plaintiffs have presented no evidence tending to show that defendant, through its agent Ferrera, made such statements in bad faith with no intent to perform or with knowledge that such predictions could not possibly materialize. In fact, Haque admits that he and Imam were not guaranteed profitable performance of their travel agency franchise, and Haque does not contend that a TAI travel agency could not possibly operate profitably with absentee ownership or with one full-time employee. Haque Dep. at 94. Thus, plaintiffs' allegations of fraudulent misrepresentation of past or present facts are without merit.

■■■ Plaintiffs second claim is that defendant's misrepresentations have caused plaintiff Haque extreme emotional distress.[5] To make out a claim for intentional infliction of emotional distress, a plaintiff must show that the defendant engaged in "a course of conduct ... [that is] so outra-

---

**5.** Plaintiffs concede that the corporate plaintiff cannot bring a claim of intentional infliction of emotional distress. Plaintiffs' resp. at 16.

geous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Roberts v. Auto–Owners Ins. Co.,* 422 Mich. 594, 608, 374 N.W.2d 905 (1985). Whether this threshold showing of outrage is met is initially for the court to decide as a matter of law. *Id.* Plaintiffs merely allege that Haque has "suffered extreme depression from [defendant's] outrageous conduct." Haque Aff. at 3. The courts have held repeatedly that cases alleging garden variety fraud or failure to live up to contractual obligations, without more, are not actions appropriately brought under a theory of intentional infliction of emotional distress. *Wendt v. Auto–Owners Ins. Co.,* 156 Mich.App. 19, 24–25, 401 N.W.2d 375 (1986); *Kintner v. Nidec–Torin Corp.,* 662 F.Supp. 112, 114 (D.Conn.1987); *Kimmel v. Peterson,* 565 F.Supp. 476, 499 (E.D.Pa. 1983). Thus, as a matter of law, plaintiffs' claim of intentional infliction of emotional distress must fail.

## ORDER

Therefore, it is hereby ORDERED that defendant's motion for summary judgment is GRANTED.

SO ORDERED.