Kevin R. COOK and K. Cook Enterprises, Inc., Plaintiffs,

v.

LITTLE CAESAR ENTERPRISES, INC., Defendant.

Civil Action No. 95–40234.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 7, 1997.

Alan D. Penskar, Paul J. Goyette, Flint, MI, for plaintiffs.

Alan C. Harnisch, Harnisch & Hohauser, Bingham Farms, MI, for defendant.

### MEMORANDUM OPINION AND ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GADOLA, District Judge.

Before the court is defendant, Little Caesar Enterprises, Inc.'s ("LCE") motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56. The motion was initially filed on December 12, 1996 and seeks summary judgment as to all counts of plaintiffs', Kevin R. Cook and K. Cook Enterprises ("Cook"), first amended complaint.[1] This court held oral argument on June 4, 1997. For the reasons set forth below, this court will grant, in part, and deny, in part, LCE's motion for summary judgment.

### Background

This is essentially a breach of contract action involving a franchise agreement ("FA") between LCE and Cook. LCE operates and franchises pizzeria-style restaurants. Plaintiff Cook operates three Little Caesars restaurants in Fresno, California.

In 1989 Cook, who at the time was a deputy sheriff in Ventura County, California, investigated several different possible franchises. On or about November 29, 1989, Cook received a "Dear Prospective Franchisee" ("DPF") letter and a franchise offering circular ("FOC") from LCE's director of franchise services. The DPF stated, in relevant part, that:

---

1. On October 15, 1996, plaintiffs filed a motion for leave to file a second amended complaint ("SAC") which amended Counts I and II of the original six-count complaint and added a Count VII. On January 29, 1997, Magistrate Judge Marc L. Goldman granted plaintiffs leave to file their SAC. The SAC was served on LCE on February 7, 1997. On March 31, 1997, LCE filed its motion for summary judgement as to all counts of the SAC.

The first document which a prospective franchisee signs is an Option Agreement. The Option Agreement defines a non-exclusive area in which the franchisee can develop his or her first unit. Each time a franchisee has gained site approval and the Franchise Option Committee's approval to construct another unit, a Franchise Agreement is executed covering that unit, outlining an exclusive one (1) mile radius around that store.

Even though, in North America, Little Caesars does not grant exclusive development territories, one of our corporate goals is to have our franchisee develop multiple units.

The FOC stated, in relevant part, that:

The Franchisee is appointed as the exclusive LITTLE CAESAR Franchisee for a specific geographic area. The area of territorial exclusivity of the LITTLE CAESAR Franchisee is defined by reference to boundaries such as streets or natural borders (e.g. a river). In any event the Franchisee's exclusive territory shall be so defined that no LITTLE CAESAR pizza restaurant shall be operated or opened within an approximate one mile radius of the Franchisee's location throughout the period of the Franchise Agreement ... subject to the provision that said borders shall not be required to be at precise one mile distances from the franchise location at all points. Where a franchise location is situated at a point close to a market area border, other borders may be extended to take into account the fact that some borders may be less than one mile from the franchise location.

Cook was directed by LCE to Robert Moglia ("Moglia"), an LCE real estate representative in Fresno, in January or February of 1990. Cook has testified that at that time Moglia stated that Cook "would be able to have [exclusive rights to develop LCE franchises] east of Blackstone, [and] Jean [Aboujaoude] would be able to have [the right to develop] west of Blackstone. Blackstone/41." [2] Cook and Moglia allegedly mod-

ified area maps which memorialized this division of the Fresno market. Those maps, however, are not part of the record before this court.

Thereafter, on April 16, 1990, Cook signed a franchise option agreement ("FOA"). Cook signed the FOA after he had read the agreement and had an opportunity to have an attorney review it. Cook declined, however, to have an attorney review the FOA. The FOA provides, in relevant part, that:

WHEREAS, OPTIONEE desires to obtain from LITTLE CAESARS the non-exclusive right and option to establish a certain distinctively styled carry-out restaurant under the trade name "LITTLE CAESAR" ("RESTAURANT") within the geographical area generally described as CALIFORNIA: THE FRESNO ADI ...

1. LITTLE CAESAR hereby grants to OPTIONEE the non-exclusive right and option to establish one (1) Restaurant ... within the [FRESNO ADI] at a location to be approved by LITTLE CAESAR ...

\* \* \* \* \* \*

10. This Agreement constitutes the entire Agreement between LITTLE CAESAR and OPTIONEE in respect of the subject matter thereof and this Agreement supersedes all prior and contemporaneous agreements between LITTLE CAESAR and OPTIONEE in connection with the subject matter of this Agreement. No officer, employee or other servant or agent of LITTLE CAESAR or OPTIONEE is authorized to make any representation, warranty or other promise not contained in this Agreement. No change, termination or attempted waiver of any of the provisions of this Agreement shall be binding unless in writing and signed by LITTLE CAESAR and OPTIONEE.

. . . . .

15. OPTIONEE acknowledges that:

A. It has no knowledge of any representations by LITTLE CAESAR or its officers, directors, shareholders, employ-

---

**2.** Blackstone and Highway 41 run parallel in relatively close proximity to each other and are purportedly the main north-south artery in Fres-

no. Aboujaoude had a franchise on the west side of Fresno when Cook came to the city.

ees, agents or servants about the business contemplated by this Agreement.

In accordance with the FOA, Cook opened his first LCE restaurant ("Restaurant 558–001") in November of 1990. In March of 1991 Cook attended LCE's national franchisee convention in Orlando, Florida where he met, in a small "round-table" session, with senior LCE executives. Cook claims that at the meeting LCE executives modified maps to reflect Cook's exclusive right to develop "east of Blackstone" while Aboujaoude would develop "west of Blackstone."

On April 8, 1991, Cook signed a franchise agreement ("FA") for restaurant 558–001. Cook read the FA and had an opportunity to consult with an attorney before signing the FA. Cook, however, chose not to have an attorney review the FA. The FA provides, in relevant part, that:

I.A. Subject to the terms and conditions of this Agreement, LITTLE CAESAR hereby grants to Franchise Owner the exclusive franchise to establish, own and operate a LITTLE CAESAR type C restaurant ("Restaurant"), including the right to use the LITTLE CAESAR System and the Licensed Rights at the Restaurant, and to be identified as a member of the LITTLE CAESAR System for so long as this Agreement is in force and effect, and Franchise Owner is not in default hereof.

\* \* \* \* \* \*

II. B. LITTLE CAESAR shall not, so long as this Agreement is in effect, and Franchise Owner is not in default hereof, establish, operate or enfranchise any other LITTLE CAESAR Restaurant utilizing the LITTLE CAESAR name within Franchise Owner's "exclusive territory." The "exclusive territory" is defined as a geographical area determined by drawing a circle around the location set forth in Section II–A above, which circle has its center at said location and a radius of one mile. In the case of an overlap between Franchise Owner's exclusive territory and the exclusive territory of another Franchise

Owner, the location at which a Restaurant shall first be opened and operating shall take precedence.

V. A.

1. Franchise Owner understands and agrees that its license under said Proprietary Marks is non-exclusive and that LITTLE CAESAR in its sole discretion has the right to operate restaurants and sell equipment and supplies under said marks, and to grant licenses in, to and under such terms and conditions as LITTLE CAESAR deems fit, subject to the provisions of section II(B) of this Agreement.

\* \* \* \* \* \*

XXII. This Agreement and the exhibits attached hereto, if any, constitute the entire, full and complete Agreement between Franchise Owner and LITTLE CAESAR, concerning the subject matter hereof, and supersede all prior agreements, if any. Neither Franchise Owner nor LITTLE CAESAR may change or modify Franchise Agreement unless the change or modification is in writing and signed by both the parties to this Agreement.

\* \* \* \* \* \*

XXV. Franchise Owner acknowledges that:

A. It has no knowledge of any representations by LITTLE CAESAR or its officers, directors, shareholders, employees, agents or servants about the business contemplated by this Agreement, that are contrary to the terms of this Agreement or the documents incorporated herein, and further represents to LITTLE CAESAR as an inducement to its entry into this Agreement, that it has made no misrepresentations in obtaining this Agreement.

In January or February of 1992, another franchisee, Scott Hellum and Robert Fino ("Hellum and Fino") opened a LCE restaurant in Clovis, California, a city that abuts Fresno on the east and which Cock claims fell within his exclusive area for development. Cook complained to LCE. Moglia also apparently voiced his opposition to Hellum and Fino entering into that market and wrote a

memo to that effect dated August 8, 1992. That memo, however, is not part of the record before this court.

Thereafter, Cook opened his second restaurant ("Restaurant 558–002") on May 26, 1992 and signed a FA for it on July 1, 1992. Cook signed a FA for his third restaurant ("Restaurant 558–003") on May 20, 1993. Prior to signing both FAs, Cook had the opportunity to read them and to consult with an attorney. The FAs for restaurants 558–002 and 558–003 contain the same provisions as the FA for Restaurant 558–001.

Plaintiffs do not identify exact dates, but claim that at two more national franchise conventions subsequent to the execution of FA 558–001 more oral and written representations and/or modifications, i.e. maps, were made by LCE executives concerning the exclusive development territory.

Thereafter, from approximately October 1992 to July 1993, Cook engaged in a litany of correspondences with LCE which reflected his concern about Hellum and Fino's entrance into the Fresno market. Cook also claims that a Hellum and Fino franchise, although located west of Blackstone, nevertheless, "encroaches" upon two of his franchises, detrimentally affecting their sales.

There are, however, no LCE restaurants operating within a one mile radius, or for that matter a two mile radius, of any of Cook's three restaurants.

In 1994, Cook decided to seek a buyer for his three stores. On August 1, 1994, Cook and Aboujaoude signed a purchase agreement ("PA") for Cook's three restaurants. The PA set forth a purchase price of $735,000, $170,000 of which was to be financed by Cook. On August 29, 1994 LCE's president, David H. Deal, disapproved the PA citing the relationship of the total purchase price to annualized sales of the stores and the very limited amount of capital that Aboujaoude was putting in. LCE's financial analyst confirmed the "excessive" purchase price and lack of Aboujaoude's liquidity and did not recommend approval of the transaction. Cook contests this decision as unreasonable.

Thereafter, in May of 1996, Cook decided to seek approval to close restaurant 558–003, at the First and Herndon streets location, because it was losing sales to Hellum and Fino's second and third franchises. LCE rejected the application for closure.

Plaintiffs' SAC alleges in Count I, breach of contract; in Count II, breach of implied covenant of good faith and fair dealing; Count III, fraudulent misrepresentation; Count IV, violation of the Michigan Franchise Investment Law ("MFIL"); Count V, tortious interference with contractual and advantageous relationships; Count VI, innocent misrepresentation; Count VII declaratory judgment.

## Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the non-moving party's case on which the non-moving party would bear the burden of proof at trial. *Martin v. Ohio Turnpike Commission*, 968 F.2d 606, 608 (6th Cir.1992); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the non-moving party. *60 Ivy Street Corporation v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). The court is not required or permitted, however, to judge the evidence or make findings of fact. *Id.* at 1435–36. The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *Id.* at 1435.

A fact is "material" for purposes of summary judgment where proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th

Cir.1984). In other words, the disputed fact must be one which might affect outcome of the suit under the substantive law controlling the issue. *Henson v. National Aeronautics and Space Administration,* 14 F.3d 1143, 1148 (6th Cir.1994). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* Accordingly, where a reasonable jury could not find that the non—moving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Feliciano v. City of Cleveland,* 988 F.2d 649 (6th Cir.1993).

Once the moving party carries its initial burden of demonstrating that no genuine issues of material fact are in dispute, the burden shifts to the non-moving party to present specific facts to prove that there is a genuine issue for trial. To create a genuine issue of material fact, the non-moving party must present more than just some evidence of a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986):

> There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the [non-moving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted); *see also Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Consequently, the non-moving party must do more than raise some doubt as to the existence of a fact; the non-moving party must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transp. Serv., Inc.,* 738 F.Supp. 214, 217 (E.D.Mich.1990), *aff'd,* 929 F.2d 701 (6th Cir.1991).

## Discussion

### Count I

Court I alleges a breach of contract. Specifically, Cook alleges that LCE, through its real estate representatives, promised and represented that he would be granted an exclusive territory "east of Blackstone in the city of Fresno" and exclusive development rights to Clovis and Sanger, California. Cook further alleges that LCE breached said agreements by permitting other franchisees to open and operate outlets within the area previously promised exclusively for plaintiffs.

■■ In this diversity action, this court must apply the choice of law rules in the state in which it sits. *Mahne v. Ford Motor Co.,* 900 F.2d 83, 85 (6th Cir.1990) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). In general, Michigan law permits parties to choose for themselves which state's law will govern their contract. *Liberty Mutual Insurance Co. v. Vanderbush Sheet Metal Co.,* 512 F.Supp. 1159, 1169 (E.D.Mich. 1981) (citing cases.) Each of the FAs provides that Michigan law should govern the claims in this action. Accordingly, Michigan law controls this action.

■ Michigan follows the general parol evidence rule ("PER"), which does not permit extrinsic evidence to contradict the terms of a written contract that was intended by the parties to be a complete expression of their agreement, *American Anodco, Inc. v. Reynolds Metals Co.,* 743 F.2d 417, 422 (6th Cir.1984); *Central Transp., Inc. v. Fruehauf Corp.,* 139 Mich.App. 536, 362 N.W.2d 823, 827 (1984). The Michigan Supreme Court, however, has held that before applying the PER:

> there must be a finding that the parties intended the written instrument to be a complete expression of their agreement as to the matters covered. Extrinsic evidence of prior or contemporaneous agreements or negotiations is admissible as it bears on this threshold question of whether the written instrument is such an 'integrated' agreement.

*Nag Enterprises v. All State,* 407 Mich. 407, 410, 285 N.W.2d 770 (1979). This court has held that "where a valid and binding agreement is integrated, it supersedes inconsistent terms or prior agreements and previous negotiations to the extent that it is inconsistent

with them.'" *John Harris & Associates, Inc. v. Day,* 916 F.Supp. 651, 656 (E.D.Mich. 1996) (quoting *Ditzik v. Schaffer Lumber Co.,* 139 Mich.App. 81, 88, 360 N.W.2d 876 (1984)).

There is no dispute that the FOA provides for a non-exclusive right and option to establish one LCE restaurant in the Fresno area; that it contained an integration clause; and an express acknowledgment by Cook that he had no knowledge of any representations made by agents of LCE regarding the subject matter of the FOA.

Moreover, there is no dispute that the FAs for Restaurants 558–001, 558–002, and 558–003 each granted Cook the exclusive franchise to operate one Little Caesars restaurant with an "exclusive territory" containing the geographical area within a one mile radius of each restaurant. Furthermore, each FA references that the license granted to Cook is nonexclusive and that LCE, in its sole discretion, has the right to operate restaurants and to grant licenses to others subject to the one mile radius "exclusive territory." Finally, each FA contains an integration clause and an acknowledgment by Cook that Cook has no knowledge of any representations by LCE that are contrary to the terms of the FA.

■ In order to overcome the PER, Cook must establish an ambiguity in the FA. *See Goodwin, Inc. v. Orson E. Coe Pontiac, Inc.,* 392 Mich. 195, 209–10, 220 N.W.2d 664 (1974) (stating that "[w]here ambiguity may exist in a contract, extrinsic evidence is admissible to prove the existence of ambiguity.") Cook contends that an ambiguity exists in the FA for two reasons. First, he argues that an ambiguity exists because in section II–B of the FA, LCE uses the language "establish, operate or enfranchise," while in section V–A.1 LCE only uses the language "license." Cook contends that these terms have different meanings as used in the FA and that therefore it is ambiguous whether the term "license" in section V–A.1 includes and/or contemplates that LCE can "enfranchise," in its sole discretion, outside the one mile radius.

This court, however, is not convinced by this argument. The plain language of V–A.1 undermines Cook's position in that it states,

in relevant part, that: "Franchise Owner understands and agrees that *its license* ... is non-exclusive...." (emphasis added). For Cook's argument, that ambiguity exists, to succeed this court must accept the premise that "license" means franchise when referring to Cook in the beginning of V–A.1, but later in the same paragraphs, when "license" refers to LCE, it does not include franchise. Such reasoning is plainly flawed.

■ Second, Cook argues that the DPF letter and deposition testimony of LCE executives established a LCE standard of 15,000 persons per franchise. Cook argues that since none of the FAs address a population standard, they are ambiguous. It is not at all apparent to this court, however, how the omission of any reference to the population necessarily creates an ambiguity since a population ratio is simply another means of establishing an exclusive territory which is unambiguously covered in the FA in geographical terms. Even if this court could somehow construe the absence of the population standard to be ambiguous, any extrinsic evidence concerning the population standard does not benefit Cook as it is undisputed that all three of his stores enjoy population ratios better than 1:15,000. Only if the FA language, or the absence thereof, is given the unnatural and contrived construction urged by the plaintiff does an ambiguity appear. *Cf. General Aviation Inc. v. Cessna Aircraft Co.,* 915 F.2d 1038, 1041 (6th Cir.1990).

Rather than establishing an ambiguity in the FA, plaintiff is attempting to contradict an unambiguous term contained in the FA, to wit: the "exclusive territory." In support of his position, that the parties agreed to an exclusivity area east of Blackstone in Fresno, Cook alleges that prior to signing the FOA Mr. Moglia represented that Cook would be granted the exclusive right to develop LCE franchises "east of Blackstone."

In a recent case before this court, *A & B Steel Shearing & Processing, Inc. v. U.S.,* 934 F.Supp. 254 (E.D.Mich.1996), a similar situation arose. In *A & B Steel,* the plaintiff was arguing that although the contract for the sale of a lot provided for a payment of

$152,000, there was a verbal agreement that the actual price would be $76,000.00. In granting summary judgment for the defendant, this court stated that:

> In the present case, the contract could not be more clear that the purchase price was $152,000. There is absolutely no indication that this unambiguous term was open to further negotiation between the parties. Plaintiff's only claim is that the contract was a mutually agreed upon lie. This does not create an ambiguity in the contract.

*Id.* at 258.

Similarly, in the instant case, plaintiff is contending that the exclusive territory "agreed upon" was east of Blackstone notwithstanding that the FA unambiguously provides for an exclusive territory one mile in radius. Accordingly, this court holds that the writing was meant to be the complete expression of the parties' agreement with respect to "exclusive territory" and that plaintiff may not use parol evidence to elude the clear provisions of the contract. *See Id.*[3]

In this regard, this court is in full agreement with *Boulevard Bank Nat'l Ass'n v. Adams Newspapers, Inc.,* 787 F.Supp. 122 (E.D.Mich.1992) wherein the court stated:

> To hold otherwise would mean that no matter how well-crafted and completely integrated a contract may be, if a party submits an affidavit that asserts a different oral agreement exists ... parol evidence would always be admissible and a trial would always be necessary. Such a result would turn the law of contracts on its head.

*Id.* at 125.

█ Cook also argues that at various national franchise conventions, during which Cook met with senior LCE executives and

Mr. Moglia, Fresno-area maps were reviewed and were marked to reflect the exclusive territory agreed upon. Cook contends that those maps constitute "writings" which under *Morley Brothers, Inc. v. F.R. Patterson Construction Co.,* 266 Mich. 52, 253 N.W. 213 (1934) can establish an oral modification of the FA notwithstanding that the FA requires any subsequent modification to be in writing and signed by both parties.

Cook's reliance on *Morley Brothers,* however, is misplaced. In *Morley Brothers,* the parties disputed what hardware items were covered by the contract in question which provided that "extras shall be agreed upon in writing." The Supreme Court of Michigan held that a written contract may be varied by a subsequent parol agreement unless forbidden by the statute of frauds, notwithstanding that the contract stipulates that it is not to be changed except by agreement in writing. *Id.* at 55–56, 253 N.W. at 214.

In *Kovacs v. Electronic Data Systems Corp.,* 762 F.Supp. 161 (E.D.Mich.1990), however, Judge Suhrheinrich distinguished *Morley Brothers* noting that the *Morley Brothers* contract contained, in addition to a provision not to vary the terms of a contract unless agreed to in writing, language which required approval by an officer of EDS before any modification to the contract could become effective. *Id.* at 164. Judge Suhrheinrich concluded that such language rendered plaintiff's reliance upon *Morley Brothers* inapposite and any oral assurance ineffective as a matter of law. *Id.*

This court finds that the instant contract language is analogous to that in *Morley Brothers* and that therefore any alleged oral modification of the FA is ineffective as a matter of law. The instant contractual lan-

---

**3.** Cook also directs this court to the FOC which states that "[t]he area of territorial exclusivity of the [LCE] Franchisee is defined by reference to boundaries such as streets or natural borders (e.g. a river)" and to the "WHEREAS" clause in the FOA which states that Cook "desires to obtain ... [a LCE restaurant] ... within the geographical area generally described as [Fresno, California]." Neither of these extrinsic items, however, establish any ambiguity in the FA. *See Goodwin, supra,* 392 Mich. at 209–10, 220 N.W.2d 664. Instead, they are completely consistent with the FA. The FOC states that: "In any

event the Franchisee's exclusive territory shall be so defined that no LITTLE CAESAR pizza restaurant shall be operated or opened within an approximate one mile radius of the Franchisee's location throughout the period of the Franchise Agreement." The FOA specifically refers to the "geographical area" as the "Optioned Area" within which LCE can grant the franchisee the non-exclusive right" to establish a LCE restaurant. The FA is fully consistent with the FOA in that the FA establishes the exclusive one-mile territory within the geographical area of Fresno, California.

guage provides that there can be no modification of the FA "unless the change or modification is in writing *and* signed by both the parties to this Agreement." As in *Morley Brothers* and the cases cited therein, the additional language cited in the instant contract, to wit: "signed by both parties to this Agreement," takes this case out from under the *Morley Brothers* holding in that it, in effect, requires the approval of an officer of LCE.[4] It is undisputed that neither party signed the maps. Accordingly, none of the subsequent maps constitute a writing for purposes of modifying the FA. Therefore, summary judgment is appropriate as to Count I.[5]

**Count II**

In Count II, plaintiffs claim that LCE breached the implied covenant of good faith by encroaching upon Cook's exclusive territory, i.e. east of Blackstone in the city of Fresno, causing him to sustain damages. In so arguing, plaintiff primarily relies on *Scheck v. Burger King Corp.*, 756 F.Supp. 543 (S.D.Fla.1991).

In *Scheck*, the court denied the franchisor's motion for summary judgment relating to a claim that the franchisor breached an implied covenant of good faith and fair dealing under Florida law. Specifically, Scheck alleged that the covenant was breached when Burger King converted a restaurant to a Burger King franchise two miles away from plaintiff's restaurant. The franchise agreement therein did not specifically grant or imply an exclusive territory to Scheck or expressly reserve the right to Burger King to locate other franchises in the proximate area. The *Scheck* court held that "while Scheck is not entitled to an exclusive territory, he is entitled to expect that Burger King will not act to destroy the right of the franchisee to enjoy the fruits of the contract." *Id.* at 549.

*Scheck*, however, is 1) contrary to Michigan law, 2) clearly distinguishable, and 3) has been discredited by other cases in the Southern District of Florida. The Sixth Circuit, in construing Michigan law, has stated that the " 'obligation of good faith cannot be employed, in interpreting a contract, to override express contract terms.' " *General Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1041 (6th Cir.1990); *Van Arnem Co. v. Manufacturers Hanover Leasing Corp.*, 776 F.Supp. 1220 (E.D.Mich.1991). In the instant case, section V–A.1 of the FA provides that LCE has reserved "in its sole discretion . . . the right to . . . grant licenses to others in, to and under such terms and conditions as LITTLE CAESAR deems fit, subject to the provisions of section II(B) of this Agreement." Section II(B) of the FA, of course, defines the Franchise Owner's "exclusive territory." As such, LCE has expressly reserved the right to license franchises outside of the franchisee's one-mile exclusive territory. Accordingly, the implied covenant of good faith and fair dealing cannot be employed to override that express term of the FA under Michigan law.

Moreover, even under *Scheck* summary judgment would not be appropriate as *Scheck* is distinguishable from the case at bar. In *Scheck*, the court acknowledged that if "Burger King [had] maintained the sole and unlimited right to establish other Burger King restaurants at any location desired," its holding would likely have been different.[6] As discussed above, this court finds that sections V–A.1 and II–B of the FA expressly provide that LCE has the right to locate other franchise restaurants anywhere outside the one mile "exclusive territory" of each of Cook's restaurants. Since LCE properly reserved for itself the exclusive right to establish LCE franchises outside of the franchisee's "exclusive territory," *Scheck* is inapposite.

---

4. Both the FOA and the FA were signed by Denise Ilitch Lites, Senior Executive Vice President.

5. Plaintiffs' "encroachment" theory under Count I, which was added in the SAC, is essentially derivative of the "exclusive territory" theory. In fact, both parties make substantially the same arguments with regards to the "encroachment"

theory as they do with regards to the breach of contract claim. Accordingly, this court's discussion regarding Cook's beach of contract claim is equally applicable to his "encroachment" theory.

6. *Scheck v. Burger King Corp.*, 798 F.Supp. 692, 697 (S.D.Fla.1992).

Finally, this court notes that at least two courts in the Southern District of Florida, have expressly refused to follow *Scheck*. In *Barnes v. Burger King Corp.*, Bus. Fran. Guide (CCH) ¶ 10,932 (S.D.Fla.1996) the court held that "if [the franchisee] is unable to maintain a claim for breach of the express terms of the Franchise Agreement, then [the franchisee] cannot maintain a claim for breach of the implied covenant of good faith." *Id.* at 28,208. *See also Burger King Corp. v. Weaver*, Bus. Fran. Guide (CCH) ¶ 10,762 (S.D.Fla.1995) (stating that "[t]o the extent that our decision today may conflict with *Scheck*, we find that *[Scheck]* read Florida law more expansively than is warranted by the caselaw."). Accordingly, this court finds that summary judgment in favor of LCE as to Count II is appropriate.

**Count III**

In Count III, plaintiffs claim that the statements allegedly made by Mr. Moglia constituted fraudulent misrepresentation. Specifically, plaintiffs claim that "Plaintiff Cook was promised that he would be permitted to obtain the entire territory 'east of Blackstone in the City of Fresno' should he elect to become a franchisee with Little Caesar" and that "Plaintiff Cook was informed by the Little Caesar's real estate representative . . . that a certain 'Peggy Balsley' would not be developing any additional stores in the greater Fresno, California market and that Plaintiff Cook would also be allowed to exclusively develop locations in the nearby cities of Clovis and Sanger."

 It is well settled, however, that under Michigan law, in order "to establish fraud 'the statements alleged to be false must relate to past or existing facts, and not to a future promise or expectation.'" *Two Men and a Truck v. Two Men and a Truck*, 955 F.Supp. 784 (W.D.Mich.1997) (quoting *Haque Travel Agency, Inc. v. Travel Agents Int'l, Inc.,*, 808 F.Supp. 569, 572 (E.D.Mich. 1992). In *Hi–Way v. Int'l Harvester*, 398 Mich. 330, 247 N.W.2d 813 (1976), the Su-

preme Court of Michigan affirmed the Court of Appeals' reversal of judgment for the plaintiffs in a case strikingly similar to the instant case. In *Hi–Way*, plaintiff, a car and truck dealer, sought to become a franchisee of defendant, a nationwide car and truck dealer. During negotiations for a franchise in the Alpena area, plaintiff claimed that defendant assured him that no other franchise would be granted in that area. Thereafter, plaintiff signed a franchise agreement which made no mention of the exclusivity agreement and moreover contained an integration clause similar to the instant clause. *Id.* at 333–35, 224 N.W.2d 879. The Supreme Court of Michigan reaffirmed the rule that "an action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact. Future promises are contractual and do not constitute fraud." *Id.* at 336, 224 N.W.2d 879. In *Macklem v. Fales*, 130 Mich. 66, 89 N.W. 581 (1902), the Supreme Court stated:

> Since a fraud must relate to facts then existing or which have previously existed, the general rule is that fraud cannot be predicated upon statements promissory in their nature and relating to future actions, nor upon the mere failure to perform a promise, or an agreement to do something at a future time, or to make good subsequent conditions which have been assured. Nor, it is held, is such nonperformance alone even evidence of fraud. Reasons given for this rule are that a mere promise to perform an act in the future is not, in a legal sense, a representation, and a failure to perform it does not change its character. Moreover, a representation that something will be done in the future, or a promise to do it, from its nature cannot be true or false at the time when it is made. The failure to make it good is merely a breach of contract, which must be enforced by an action on the contract, if at all.

It is plain that the misrepresentations [7] which plaintiffs allege were made, do not

7. At oral argument, counsel for Cook attempted to distinguish the *Hi–Way* holding by arguing that in *Hi–Way* "promises" were at issue while in the instant case only "representations" were made. This court need not discuss whether the

*Hi–Way* holding turned on this distinction (superficially this court is nonplused by such an argument since the words "promise" and "representation" appear to be used interchangeably in *Hi–Way*) since plaintiffs' complaint is, itself, re-

refer to past or present fact but, instead, only refer to things which might happen in the future. Accordingly, summary judgment in favor of defendant is appropriate as to this count.[8]

**Count VI**

█ Taken out of order, Count VI, which alleges "innocent misrepresentation" and is otherwise identical to Count III, is likewise ripe for summary judgment for the same reasons that summary judgment was granted on Count III.

The Supreme Court of Michigan, in *U.S. Fidelity & Guaranty v. Black*, 412 Mich. 99, 313 N.W.2d 77 (1981) discussed, in great detail, the differences between "fraudulent misrepresentation" and "innocent misrepresentation." The *Black* court stated:

> Briefly then, while the traditional and innocent misrepresentation actions are substantially similar, they are also significantly different. On the one hand, the innocent misrepresentation rule differs in eliminating *scienter* and proof of the intention that the misrepresentation be acted upon. However, on the other hand, the innocent misrepresentation rule adds the requirements that the misrepresentation be made in connection with making a contract and the injury suffered by the victim must inure to the benefit of the misrepresenter.

*Id.* at 118, 313 N.W.2d 77. Notably, there is no mention made, nor was this court able to locate any case law that would indicate, that the requirement that a misrepresentation pertain to a past or present fact is not applicable to an "innocent misrepresentation" claim. Accordingly, this court will grant summary judgment in favor of defendant as to Count VI.

**Count IV**

In Count IV, Cook alleges violations of the Michigan Franchise Investment Law ("MFIL") M.C.L. § 445.1501; M.S.A. § 19.854(1), *et seq.* Specifically, Cook alleges that LCE violated the MFIL by 1) making "untrue statements of material fact ... [which] operated as fraud and deceit against Plaintiffs;" 2) "enfranchising competing franchises within Plaintiff Cook's promised exclusive area of development that encroach upon Plaintiff's units to the extent they draw sales away;" and 3) "forcing Plaintiffs to continue to operate the 'First and Herndon' site where no contractual right exists nor any established standards for evaluating closure exist."

█ The first allegation, regarding fraudulent misrepresentations, is identical to Cook's claims under Counts III and VI except that they, of course, invoke Section 5 of the MFIL rather than the common law. Section 5 of the MFIL provides that:

> A person shall not, in connection with the filing, offer, sale, or purchase of any franchise, directly or indirectly:
>
> (a) Employ any device, scheme, or artifice to defraud.
>
> (b) Make any untrue statement of material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.
>
> (c) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

M.C.L. § 445.1405; M.S.A. § 19.854(5). While this court found that Counts III and VI are not actionable under the common law of Michigan because they relate to future promises, it is not prepared to grant summary judgment on the same basis in Count IV. The MFIL expressly states that " 'fraud' and deceit' are not limited to common law fraud or deceit."[9] *See* M.C.L. § 445.1503.

plete with references to "promises" made by LCE.

**8.** The *Hi–Way* court noted that there is a "bad faith" exception to the general rule that fraudulent misrepresentation is not actionable for future promises, *Hi–Way*, 398 Mich. at 337, 247 N.W.2d 813, however, there is absolutely no evidence before the court that would support a finding of "bad faith." *See Hi–Way*, 59 Mich. App. at 373, 229 N.W.2d 456.

**9.** This court also notes that the plain language of the MFIL refers to "*any* untrue statement of material fact" without regard to whether it is a misrepresentation of a past or present material fact, thereby providing another reason for not granting summary judgment on this basis.

The statute, however, offers no further clarification of what does constitute fraud or deceit under the MFIL.

 LCE argues that since fraudulent misrepresentation simply constitutes a contractual fraud claim, *see General Aviation, Inc. v. Cessna Aircraft Co.*, 13 F.3d 178, 183 (6th Cir.1993), Cook cannot prevail because he cannot satisfy the justifiable reliance prong of the fraudulent misrepresentation test.[10] Specifically, LCE argues that since Cook read and signed the FOA and the FA, which contained integration clauses, he cannot now claim he justifiably relied upon alleged fraudulent misrepresentations. Cook, on the other hand, argues that since LCE's obligation to be truthful is statutory not contractual and since the MFIL should be construed in light of its remedial nature, it was not unreasonable for him to rely on alleged misrepresentations made by LCE in the DPF and the FOC notwithstanding the merger clauses in the FOA and FA.[11]

There are no Michigan cases construing fraud or deceit under the MFIL. This court has examined, however, case law interpreting, Illinois and Indiana franchise laws, each of which have an anti-fraud section worded almost identically to Michigan's.[12] Those cases hold that a fraud claim cannot stand absent evidence of reasonable or justifiable reliance and that the existence of an integration clause in a franchise agreement signed by the franchisee makes reliance on such representations unreasonable.

In *Bonfield v. AAMCO Transmissions, Inc.*, 708 F.Supp. 867 (N.D.Ill.1989), the court, while acknowledging the remedial nature of the Illinois Franchise Act,[13] found that the anti-fraud section parrots the language of SEC Rule 10b–5.[14] The court, in looking to traditional Rule 10b–5 principles, stated that "justifiable reliance [is] an element required in every claim based on misrepresentations." *Id.* 708 F.Supp. at 876. The *Bonfield* court determined that in light of the integration clause and the franchisee's acknowledgment of it any reliance by the franchisee on any alleged misrepresentations made prior to the franchisee signing the written agreement was not reasonable. In granting summary judgment on the plaintiff's misrepresentation claims under the Illinois Franchise Act, the *Bonfield* court stated that:

**10.** *See U.S. Fidelity & Guaranty Co. v. Black*, 412 Mich. 99, 313 N.W.2d 77 (1981) (holding that the elements for false and fraudulent misrepresentation made by one party to another are 1) in a transaction between the parties, 2) any representations which are false in fact 3) and actually deceive the other, and 4) are relied on by him to his damage, are actionable, irrespective of whether the person making them acted in good faith in making them, 5) where the loss of the party deceived inures to the benefit of the other.)

**11.** Cook relies on M.C.L. § 445.1504 which states, in relevant part, that: "This act applies to all written or oral arrangements between a franchisor and franchisee in connection with the offer or sale of a franchise, including, though not limited to, the franchise offering, [and] the franchise agreement...."

**12.** Section 6 of the Illinois Franchise Act, 815 ILCS 705/6, states in pertinent part: Fraudulent practices. In connection with the offer or sale of any franchise made in this State, it is unlawful for any person, directly or indirectly, to: (a) employ any device, scheme, or artifice to defraud; (b) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are

made, not misleading; or (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Section 27 of the Indiana Franchise Disclosure Act, Ind.Code § 23–2–2.5–27, provides: It is unlawful for any person in connection with the offer, sale or purchase of any franchise, or in any filing made with the commissioner, directly or indirectly: (1) to employ any device, scheme or artifice to defraud; (2) to make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they are made, not misleading; or (3) to engage in any act which operates or would operate as a fraud or deceit upon any person.

Both statutes also state that "fraud" and/or "deceit" as used in the statutes are not limited to common law fraud or deceit.

**13.** This court notes that while a different version of the Illinois Franchise Act was in effect at the time of the *Bonfield* decision, it was, nonetheless, substantially the same as that currently in force and cited *supra* at fn. 12.

**14.** *See* Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b).

to let [the franchisee] now claim that, in spite of all that, he was relying on an earlier alleged misrepresentation would undercut the free-market principles that underlie our law of contracts. Statutes such as the Franchise Act (and its progenitor, Rule 10b–5) work a dramatic change in caveat emptor notions—but they do not repeal freedom-of-contract doctrines in the manner [the franchisee] would seek to do here.

*Id.* at 878.

Similarly, in *Hardee's of Maumelle, Ark., Inc. v. Hardee's Food Systems, Inc.*, 31 F.3d 573 (7th Cir.1994), the court interpreted the Indiana Franchise Act to require proof of reasonable reliance to support a claim under the anti-fraud provision of the Act. At trial, the plaintiffs-franchisees alleged, *inter alia,* fraud under the Indiana Franchise Act based on alleged misrepresentations by Hardee's, the franchisor. Specifically, plaintiffs claimed that Hardee's made misrepresentations about sales estimates from its Arkansas stores, and about the possibility of buying company-owned stores after franchisees developed their initial site. After a bench trial, the trial court found that if the franchisees had relied on Hardee's alleged misrepresentations when deciding to enter into the franchise transaction, such reliance was unreasonable because the written agreement the parties signed did not include such provisions. Moreover, the agreement included an integration clause that disclaimed reliance on any such representations. *Id.* at 576. The Seventh Circuit, in upholding the district court, stated that "it is simply unreasonable to continue to rely on representations after stating in writing that you are not so relying." *Id.*

The *Hardee's* plaintiffs argued that the district court improperly considered whether their reliance on Hardee's statements was reasonable, since the Indiana Franchise Act does not include the common law requirement of reasonable or justifiable reliance. The Seventh Circuit noted, however, that Indiana courts have read a "reasonable reliance" requirement into a fraud action under the Indiana Franchise Act. *Hardee's*, 31 F.3d

at 579 (citing *Master Abrasives Corp. v. Williams*, 469 N.E.2d 1196, 1201 (Ind.App. 1984)). *See also Hacienda Mexican Restaurant of Kalamazoo Corp. v. Hacienda Franchise Group, Inc.*, 641 N.E.2d 1036 (Ind.App. 1994) (holding that franchisee did not prove reliance where the franchise agreement expressly disclaimed receipt of or reliance on any guarantees concerning revenues, profits, or success of a franchise by the franchisor.)

Plaintiffs in the instant case direct this court's attention to two cases in support of their argument that, notwithstanding the integration clause, their claim of fraud under the MFIL should stand. The first case, *Scotsman Group, Inc. v. Mid–America Distributors, Inc.*, 1994 WL 118458 (N.D.Ill.), is unreported and addresses, *inter alia,* a fraud claim under the Illinois Consumer Fraud and Deceptive Business Practices Act [15] ("FDBPA"). While the *Scotsman* court did find that the plaintiff need not plead or prove justifiable reliance under the FDBPA, it did not interpret the Illinois Franchise Act and therefore is not as persuasive as *Bonfield.*

The second case, *A.J. Temple Marble & Tile, Inc. v. Union Carbide Marble Care, Inc.*, 162 Misc.2d 941, 618 N.Y.S.2d 155 (1994), *aff'd on other grounds,* 214 A.D.2d 473, 625 N.Y.S.2d 904 (1995), aff'd, 87 N.Y.2d 574, 640 N.Y.S.2d 849, 663 N.E.2d 890 (1996), addresses a fraud claim under the New York Franchise Sales Act. There the court held that the merger clause in a franchise agreement did not preclude the franchisee's reliance on misrepresentations contained in the franchisor's promotional literature. Although the language of the anti-fraud section of the New York Act is nearly identical to that of the MFIL, the *Temple* case is distinguishable from the instant case in at least two respects.

First, unlike the instant case, the merger clause in the franchise agreement in *Temple* contained an express provision permitting reliance on the statements in the offering circular and disclosure statements. *Id.,*618 N.Y.S.2d at 158–159. Second, the franchise agreement in *Temple* contained a waiver clause wherein the franchisee agreed to

**15.** 815 ILCS 505/1, *et seq.*

waive any claims, demands or damages arising from the loss of association with the franchisor. The court was concerned that the merger *and* waiver clauses would allow the defendants to get around the anti-fraud provisions of the Franchise Act by contracting out of liability. Because the court found this to be contrary to the purposes of the New York Franchise Sales Act, it did not allow the merger and waiver clauses to bar plaintiff's claims. *Id.*, 618 N.Y.S.2d at 159.

It is not clear from the opinion what weight the court gave the merger clause, as opposed to the waiver clause, in reaching its decision. This makes the *Temple* holding one of dubious persuasiveness. In the instant case, the franchise agreement contained no waiver clause whatsoever, nor did the merger clause permit reliance on any statements or representations outside the written contract. As such, this court will follow the reasoning of the *Bonfield* and *Hardee's* courts rather than that of *Temple*. Accordingly, this court finds that if, in fact, Cook relied on any alleged misrepresentations made by LCE in the DPF or FOC, such reliance was unreasonable as a matter of law and Cook's claim of fraud under the MFIL cannot stand.

Cook's second allegation under the MFIL is based on a theory of encroachment and is also barred for the reasons previously discussed in this court's analysis of Count II.

 The third allegation raises the issue of whether LCE violated the MFIL by forcing Cook to keep restaurant 558–003 open. LCE argues that since it was not acting as the "seller" of the franchise at the time of Cook's application to close, Section 5 of the MFIL, *supra,* is not applicable. Plaintiff, on the other hand, contends that LCE omitted a material fact "in connection with the sale" of restaurant 558–003 by not representing that only LCE, in its sole discretion, could allow Cook to close the store if he could not mitigate his losses.

In *Franchise Management Unlimited, Inc. v. America's Favorite Chicken*, (Mich. App.), 221 Mich.App. 239, 561 N.W.2d 123, temporally similar conduct was found not to have occurred during the sale, or offering to sell, of the franchise so as to be actionable

under the MFIL. In *Franchise Management*, the franchisor would not approve the sale of a franchise until the franchisee agreed to release the franchisor from all claims against the franchisor as provided in the FA. In finding that the franchisor was not "selling or offering to sell," as defined in the MFIL, the court stated that:

> The Legislature's intent to restrict liability to conduct at the time of sale is clear from its specific exclusion of renewals or extensions of a franchise agreement from the definitions of the terms "offer" and "offer to sell." ... Accordingly, this Court finds that plaintiffs do not have a claim for damages because defendant's conduct did not occur when it occupied the position of a seller of the franchise.

*Id.* at 129. This court is inclined to follow the reasoning of the *Franchise Management* court and concludes that LCE's conduct in refusing Cook to close restaurant 558–003 did not occur when it occupied the position of a seller of a franchise.

 Even if this court were to find that LCE was acting as a seller, for purposes of the MFIL, plaintiffs have still not established that any untrue statement or omission of material fact was made which caused other statements to be misleading under the circumstances in which they were made. *See* MFIL § 5(b), *supra.* As discussed *infra,* the failure of the parties to address the situation in which a franchisee requests to close a franchise because it is unprofitable was, at most, an oversight which was not unambiguously addressed in the FA and which remains a question of contract interpretation for the jury. It cannot, however, be said that the parties' failure to address that situation was a material omission by LCE. Accordingly, this court grants LCE summary judgment on Count IV in its entirety.

### Count V

 In Count V, plaintiff alleges tortious interference with contractual and advantageous relationships. The elements of the tort of interference with an existing contractual relation are: 1) a contract; 2) a breach, and 3) instigation of the breach without justi-

fication by the defendant. *Woody v. Tamer,* 158 Mich.App. 764, 773–774, 405 N.W.2d 213 (1987), citing *Northern Plumbing and Heating, Inc. v. Henderson Bros., Inc.,* 83 Mich. App. 84, 93, 268 N.W.2d 296 (1978), lv. den., 405 Mich. 845 (1979). The Michigan Court of Appeals has consistently applied the elements of tortious interference set forth in *Northern Plumbing* in accordance with Restatement Torts, 2d §§ 766B and 767. *Winiemko v. Valenti,* 203 Mich.App. 411, 415, 513 N.W.2d 181 (1994). The Restatement states that:

> One who intentionally and improperly interferes with another's prospective contractual relations (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

Furthermore, Michigan courts have held that to maintain a cause of action for tortious interference, the plaintiff must establish that defendant was a "third party" to the contract or business relationship. *See Reed v. Michigan Metro Girl Scout Council,* 201 Mich.App. 10, 12, 506 N.W.2d 231 (1993) and *Dzierwa v. Michigan Oil Co.,* 152 Mich. App. 281, 287, 393 N.W.2d 610 (1986).

Defendant Little Caesar asserts that a cause of action for intentional interference cannot lie against LCE in this case because LCE is not a stranger or outsider to the proposed purchase agreement between Mr. Cook and Mr. Aboujaoude. LCE contends that each of the franchise agreements between LCE and Mr. Cook specified that any proposed sale or transfer of the franchise must be approved by LCE, and Mr. Cook's purchase agreement with Mr. Aboujaoude was expressly conditioned upon the approval of the transaction by LCE. In such a franchisor/franchisee relationship, LCE argues, a claim of intentional interference by the franchisee against the franchisor cannot lie as a matter of law.

Michigan courts have not squarely dealt with the question of whether the tort of intentional interference with contractual relations can lie in the franchisor/franchisee context. However, in states that, like Michigan, have adopted §§ 766B and/or 767 of the Restatement 2d of Torts, courts have found that where a sale of a franchise or similar entity is subject to the approval of a franchisor pursuant to a contract between the seller and the franchisor, the franchisor cannot be characterized as an "outsider" to the proposed transaction and thus is not subject to a claim of tortious interference.

In *Noller v. GMC Truck & Coach Div.,* 244 Kan. 612, 772 P.2d 271 (1989), the Kansas Supreme Court affirmed the district court's grant of summary judgment to the defendant, who plaintiff alleged had tortiously interfered with his contract to purchase a GMC franchise from the current owner of the franchise. As in the case before this court, the transaction was subject to the approval of the franchisor pursuant to the contract between GMC and its franchisee. Citing the Restatement, the court upheld the district court's finding that "the alleged interference did not arise from a relationship between Noller and a third person, but from Noller's potential relationship with GMC via the prospective franchise agreement." *Id.* at 620, 772 P.2d 271.

Similarly, in *Genet Co. v. Annheuser–Busch, Inc.,* 498 So.2d 683 (Fla. 3d DCA 1986), where plaintiffs entered into an agreement with a wholesaler to purchase the wholesalership and the wholesale agreement required approval by defendant, the court affirmed a grant of summary judgment to the defendant on a claim of tortious interference. The court stated that:

> Because plaintiffs' agreement with [wholesaler] was specifically conditioned upon [defendant's] approval, as a matter of law, [defendant] cannot be liable for tortious interference with their agreement.... The tort of willful interference with a business relationship does not exist where the defendant was the source of the business opportunity allegedly interfered with.

**416**

*Id.* at 684.[16]

In the case before this court, the facts are even more compelling than in *Noller* or *Genet.* In each of those cases, the plaintiff was the potential *purchaser* and *not* a party to the contract which provided the defendant the right to disapprove, on specified bases, the sale of a franchise or wholesalership. Here, Cook, the seller, *is* a party to the contract with LCE which gives LCE the right, under specified conditions, to approve or disapprove any sale of the franchise.[17] Thus, this court finds that LCE is not a "third party" to the transaction and Cook cannot maintain a cause of action for tortious interference. If plaintiff alleges that defendant's withholding of consent was improper under the contract, plaintiff's remedy lies in contract, not tort law. Therefore, this court grants LCE summary judgment on Count V of plaintiff's claim.

**Count VII**

In Count VII, plaintiffs seek a declaratory judgment that under the FA for restaurant 558–003 LCE cannot deny them the right to permanently close their First/Herndon store.

 Under Michigan law, if the language of a written contract is subject to two or more reasonable interpretations or is inconsistent on its face, the contract is ambiguous and a factual development is necessary to determine the intent of the parties. *Petovello v. Murray,* 139 Mich.App. 639, 642, 362 N.W.2d 857, 858 (1984) (citing *Goodwin, Inc. v. Orson E. Coe Pontiac, Inc.,* 392 Mich. 195, 220 N.W.2d 664 (1974)). It is also well-settled that the language of a contract is to be construed against the drafter of the contract. *Id.* (citing *United Coin Meter Co. v. Gibson,* 109 Mich.App. 652, 657, 311 N.W.2d 442 (1981)).

 Defendant argues that summary judgment is proper on this issue because FA

558–003 speaks plainly and unambiguously to the question of whether or not plaintiffs may permanently close a franchise. Defendant points to two clauses in the contract as addressing this issue: 1) Section V–D.8, which states that the franchise owner agrees:

> [T]o open and operate the Restaurant every day (except during such periods as it may be required by law or permitted by LITTLE CAESAR to be closed) during the hours prescribed by LITTLE CAESAR . . .

and 2) Section XVII–A, which states that the franchisee will "operate the Restaurant during the hours of operation as are prescribed by LITTLE CAESAR from time to time during the duration of this Agreement."

Plaintiffs argue that neither of these clauses address a permanent closure of a store, but only ongoing operations; thus, they should be allowed to close the store. At the very least, plaintiffs contend, the absence of any reference to the conditions or requirements for permanent closure creates an issue of fact concerning the parties' intent and LCE's practices and procedures relating to permanent closure.

This court finds that in this regard, the language of FA 558–003 is ambiguous. The agreement is subject to two or more reasonable interpretations. Although the language of Section V–D.8 includes the words "or permitted by LITTLE CAESAR to be closed," it is not at all clear that the phrase refers to permanent closure. It would be wholly reasonable to interpret the clause as referring to temporary or incidental closings precipitated by, perhaps, an emergency. Similarly, a plain reading of the clause in Section XVII does not suggest that it prohibited permanent closure, but rather that it was meant to insure regular hours of operation. Considering the extensive provisions of Section XIX concerning the consequences of termination

**16.** It appears that Florida has also adopted the Restatement 2d of Torts, sec. 766. *See Peninsula Federal Savings and Loan Association v. DKH Properties. Ltd.,* 616 So.2d 1070, 1073 (Fla. 3d DCA 1993) and *Gossard v. Adia Services, Inc.,* 922 F.Supp. 558, 560 (M.D.Fla.1995).

**17.** Although plaintiffs attempted to distinguish these cases on the basis that LCE did not have

*any* discretion to approve or disapprove the transaction once certain prerequisites were met, this court does not so read the FA. The FA specifically states that: "LITTLE CAESAR agrees not to *unreasonably* withhold its consent to a sale, assignment or transfer by Franchise Owner hereunder."

of the franchise by LCE, the absence of any such provisions accompanying the language of the clauses cited by LCE also suggests they do not address permanent closure.

As the drafter of the franchise agreement, LCE had every opportunity to spell out the conditions upon which it would or would not allow a franchisee to permanently close a franchise. While the court acknowledges that LCE may have legitimate business reasons for not allowing permanent closures without its approval, it appears that there are no provisions in the contract expressly addressing that issue. Thus, there exists a genuine issue of material fact concerning the intent of the parties on the issue of permanent closure of franchise stores by franchisees which preclude summary judgment on Count VII.

### ORDER

**THEREFORE, IT IS HEREBY ORDERED** that defendant, LITTLE CAESAR ENTERPRISES, INC.'s, motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56(c), is **GRANTED** as to Counts I, II, III, IV, V, and VI of plaintiffs Second Amended Complaint and **DENIED** as to Count VII of that complaint.

**SO ORDERED.**