OPINION OF THE COURT
Herman Cahn, J.
Defendants move, pursuant to CPLR 3211 (a) (1), (5) and (7), to dismiss those portions of the complaint (first and second causes of action) alleging violations of the New York Franchise Sales Act (General Business Law § 680 et seq.; the Franchise Act), based upon:
(a) defendants’ alleged representation that "a MarbleLife Franchise gave a franchisee the right to use the * * * recognized Union Carbide trademarks and service marks”;
(b) defendants’ concealment of the existence of an alleged *943 pre-existing "plan” to discontinue or dispose of the MarbleLife franchise system if Union Carbide Marble Care, Inc. (UCMC) failed to reach certain budgetary checkpoints or if the total investment in UCMC by its corporate parent Union Carbide Chemicals & Plastics Company Inc. (UCC&P) exceeded $7,000,000; and
(c) section 691 (3) violations by defendants Richard W. Broockmann, Gerald L. Ehrens, John A. Clerico, R.D. Kennedy, UCC&P, and Union Carbide Corporation.
In this action, plaintiff A.J. Temple Marble & Tile, Inc. (Temple), a former franchisee of Union Carbide Marble Care, Inc., seeks damages against defendants UCMC, its parent corporation Union Carbide Chemicals & Plastics Company Inc., and its "grandparent,” Union Carbide Corporation (Union Carbide), and certain of their officers and directors (hereinafter collectively referred to as defendants) for violations under the New York Franchise Sales Act (General Business Law § 680 et seq.).
Plaintiffs complaint alleges the following: In 1988, UCC&P, a company engaged in the manufacture and sale of certain specialty chemicals, learned that there was a widely expanding market for the cleaning and restoration of marble and other stone surfaces in building interiors. To facilitate entry into this market, Richard Broockmann, an officer and director of UCMC’s board of directors, developed a business plan for submission to his superiors at Union Carbide. Under the plan, UCMC would acquire a California company already in the business of marble care, Master Marble Finishing, Inc. (MMF), reproduce MMF’s techniques, equipment and chemicals, and then franchise the "system” that it had for restoring, refinishing, cleaning and caring of marble.
The plan called for Union Carbide to invest approximately $7,000,000 over a 3-to-4-year period, with the objective of launching a system of 60 to 70 franchises, and envisioned that the "UCC name w[ould] open doors at major national accounts.” The plan also contained various "check points.” As set forth in a draft of the business plan, "check points” would provide a "simple, low risk, bail-out contingency if [such] check points [were] not met.” The final version of the business plan restated its purpose as follows: "[a]t major check points, a venture evaluation would occur to control exposure and risk.”
Broockmann’s plan was approved in early 1989. Thereafter, UCC&P incorporated subsidiary UCMC, which then acquire *944 MMF. A major public relations program was launched to announce the franchise venture, and the viability and strength of the Union Carbide name was emphasized.
Plaintiff, who had been in the business of marble tile and restoration for some time, learned of UCMC in early 1990 and met with UCMC representatives in February of 1990. At the meeting or shortly thereafter, UCMC provided plaintiff with a "Unit Franchise Offering Circular,” a document required under the New York Franchise Sales Act, that purported to describe accurately the franchise being offered by UCMC. UCMC also furnished plaintiff with separate promotional literature containing certain representations about the franchise system.
Plaintiff alleges that neither the business plan nor the literature revealed that UCC&P’s commitment to franchising was limited to a $7,000,000 investment or that there were checkpoints at which Union Carbide would "bail out.” Plaintiff alleges that it was not informed at the time the franchise system was launched that UCMC had already concluded the "MMF model” for the system had been and was losing money, its management systems were inadequate, its marketing efforts were misdirected and unprofitable and its chemicals and equipment were not proprietary. When plaintiff requested to see a demonstration of UCMC’s proprietary technology, defendants refused and referred plaintiff to the information in the offering circular and other sales literature.
In subsequent negotiations, plaintiff explained to defendants and defendants acknowledged that plaintiff was primarily interested in purchasing a Union Carbide MarbleLife franchise because of the "instant credibility” that the "Union Carbide” name would provide in connection with plaintiff’s existing business, the combination of the MarbleLife system and technology could lead to higher productivity and the uniformity of a system with established procedures and performances would insure high quality labor, and therefore, high quality results.
In June 1990, plaintiff, in reliance upon UCMC’s representations, purchased four territories — three in midtown Manhattan and one in Secaucus, New Jersey — for a total consideration of $40,000. In addition, plaintiff expended approximately $230,000 in equipment, vehicles, inventory, office renovation and other items necessary for the operation of the franchises.
Subsequently, plaintiff learned that the MarbleLife’s system *945 was not proprietary, unique or special. The "proprietary” chemicals included Red Devil Stripper, Clorox Bleach and other off-the-shelf compounds that UCMC had relabeled before selling to its franchisees. Other UCMC chemicals failed to perform up to standards as a result of inconsistent chemical formulations, mislabeled chemicals and the shipment of chemicals with expired shelf lives. In addition, plaintiff encountered problems ranging from nonknowledgeable UCMC training staff to malfunctioning of the software program to a lack of field support. As a result, plaintiff alleges it was unable to implement the Union Carbide franchise system.
In November 1991, UCMC announced that it had made the decision to sell the franchise business because it was not "strategically related to UCC&P’s core business.” At that time, plaintiff alleges that Broockmann again concealed that the business plan had called for an investment limited to $7,000,000 and that such amount had been exceeded, that UCMC failed to reach its goal of 75 operational franchises and that it was unable to deal with franchisee dissatisfaction with the system.
In February 1992, however, UCMC announced that the franchise business was going to be retained by Union Carbide and would be "refocussed” so as to "increase value” to the existing franchisees. UCMC also stated that the issue of selling the system was "dead.” Plaintiff alleges, however, that defendants intended to sell the franchise business as soon as commercially possible and were in fact "refocusing” the business solely for the purpose of making it a saleable entity to carry out the business plan’s objective of a "bail out.”
UCMC subsequently received an offer to purchase its franchise system from a Detroit franchisee, Ed Williams. Plaintiff alleges that Williams was a franchisee who had no experience in either the marble care business, the chemical business or the franchise business. UCMC accepted Williams’ offer in May 1993.[1] This action followed.
Defendants now move to dismiss those portions of the complaint alleging that defendants violated the New York Franchise Sales Act (1) by representing to plaintiff in its promotional literature that plaintiff had the right to use the recognized Union Carbide trademark and service marks, and (2) by concealing a preexisting plan to dispose of the franchise *946 system if certain budgetary "check points” were not met or if Union Carbide’s total investment therein exceeded $7,000,000.
Defendants contend that to the extent plaintiff seeks to recover under the Franchise Act for defendants’ alleged misrepresentations in its promotional literature, it is barred for several reasons. First, defendants contend that as a result of the merger clause in the Franchise Agreement (the Franchise Agreement), any alleged reliance by plaintiff upon representations contained in defendants’ promotional literature was unreasonable. Section 27.01 of the Agreement provides that: "27.01 This Agreement, and all ancillary agreements executed contemporaneously herewith, constitute the entire agreement between the parties with reference to the subject matter hereof, and supersede all prior negotiations, understandings, representations and agreements, if any. Franchisee acknowledges that he is entering into this Agreement * * * as result of his own independent investigation of the business franchised hereby and not as a result of any representations about Franchisor made by its shareholders, officers, directors, employees, agents, independent contractors or other marblelife franchisees, which are contrary to the terms herein set forth or which are contrary to the terms of any offering circular, prospectus, disclosure document or other similar document required or permitted to be given to Franchisee pursuant to applicable law” (emphasis added).
Second, defendants contend that plaintiff’s misrepresentation allegations are precluded by its waiver and release of all claims it had or may have against the defendants. Paragraph 33.01 (8) provides the following waiver and release: "Franchisee expressly and specifically waives any claims, demands or damages arising from * * * the loss of association with or identification of Union Carbide Marble Care, Inc.’ whether alone or as a subsidiary of Union Carbide Chemicals and Plastics Company, Inc. and/or the Union Carbide Corporation as Franchisor hereunder” (emphasis added).
In any event, defendants assert that the alleged right to use the Union Carbide mark is inconsistent with the express terms of the promotional literature and is contrary to other clauses contained in the Franchise Agreement. The promotional literature states: "As a marblelife franchisee, you will have the right to use the marblelife name, our recognizable trademarks and service marks and our exclusive marblelife technologies and systems” (emphasis added).
*947 Defendants assert that the phrase "our recognizable trademarks and service marks” clearly refers to the trademarks and service marks of UCMC. This interpretation, defendants allege, is consistent with other clauses in the Franchise Agreement. For example, section 19.05 provides, in relevant part:
"19.05 Non-Use of Trade name
"If Franchisee shall be a corporation, it shall not use Franchisor’s Proprietary marks, or any words or symbols confusingly similar thereto, in Franchisee’s corporate name, and in particular Franchisee shall not use the words 'Union Carbide’, 'Union Carbide Marble Care’, 'ucmc’, 'marblelife’, or any variant thereof as part of its corporate name.” Similarly, section 19.06 states:
"19.06 Required Means of marblelife Identification
"The Business franchised hereunder shall do business under the assumed name 'marblelife’, and Franchisee shall, at his sole cost and expense, perform all filing and procure all required or necessary governmental approvals or registrations required to do business.”
Thus, defendants claim that any alleged misrepresentations by defendants as to the use of the Union Carbide trademark and service marks are not actionable under the Franchise Act.
Defendants’ contentions are without merit. As a threshold matter, the merger clause in and of itself does not bar plaintiff’s reliance on misrepresentations contained in defendants’ promotional literature. Section 27.01 permits plaintiff to rely upon representations made in "the offering circular, prospectus, disclosure document or other * * * document * * * required or permitted to be given to Franchisee pursuant to applicable law.” Such "other * * * document,” of course, may encompass representations in the promotional literature.
Notwithstanding the foregoing, the court believes that the existence of the merger and waiver clauses would not bar plaintiff’s statutory claims under the Franchise Act.[2] Prior to 1981, franchise sales fraud was endemic. In its 1979-1980 session, the New York Legislature heard testimony that, since 1972 alone, an estimated 14,000 New Yorkers had been victimized by fly-by-night and unethical franchisors and that *948 New Yorkers had lost nearly $40 million through franchise fraud (Kaufmann, Practice Commentary, McKinney’s Cons Laws of NY, Book 19, General Business Law art 33, at 587-588). This widespread franchise abuse prompted the Legislature to enact the New York Franchise Sales Act. Its purpose was to curb such abuses and to protect the would-be franchisee from fraudulent and unethical practices (ibid.). The Franchise Act deliberately was drafted to incorporate stringent disclosure and broad antifraud provisions (ibid.). General Business Law § 687 (2) exemplifies the broad scope of its antifraud provisions:
"Fraudulent and unlawful practices * * *
"2. It is unlawful for a person, in connection with the offer, sale or purchase of any franchise, to directly or indirectly:
"(a) employ any device, scheme, or artifice to defraud.
"(b) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. It is an affirmative defense to one accused of omitting to state such a material fact that said omission was not an intentional act.
"(c) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.”
In keeping with the enactment of the broad antifraud provisions, section 687 specifically prohibits a franchisee from assenting to merger or a release of waiver of any duty or liability imposed by the Franchise Act: "5. It is unlawful to require a franchisee to assent to a release, assignment, novation, waiver or estoppel which would relieve a person from any duty or liability imposed by this article” (emphasis added). Subdivision (4) also states: "4. Any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this law * * * shall be void” (emphasis added).
Keeping in mind the policies underlying the enactment of the Franchise Act and the deliberate incorporation of broad antifraud provisions into the statute, the court finds that the Legislature intended to prevent a franchisor from contracting out of the liability imposed on the franchisor under the Act by the inclusion of merger and waiver clauses. However, the merger and waiver clauses in the case at bar do exactly that— they impermissibly permit defendants to get around the anti- *949 fraud provisions of the Franchise Act by contracting out of such liability. Since this is contrary to the purposes of the New York Franchise Sales Act, the merger and waiver clauses do not bar plaintiff’s claims therein (see also, Kaufmann 1989 Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 19, General Business Law art 33, at 343-344).[3]
Defendants’ contention that the express terms of the promotional literature did not give plaintiff the right to use the Union Carbide mark is without merit, as well. A plain reading of the representations at issue does not unequivocally support defendants’ interpretation. The phrase "our recognizable trademarks and service marks” is ambiguous and may very well refer to Union Carbide’s trademarks and service marks. The record lends support to plaintiff’s position. For example, an internal defendants’ memorandum explicitly acknowledges plaintiff’s interest in becoming a UCMC franchisee based upon the advantages it would have in being affiliated with the Union Carbide name. In another example, defendants’ confidential operating manual directed franchisees to place the "Union Carbide” name and mark in all capital letters prominently as the first line of the exterior lettering on a franchisee’s van.
Other provisions in the Franchise Agreement do the same: "Franchisee shall affix Franchisor’s Proprietary Marks upon the Operational Base and such vehicles * * * and such other objects, in such size, color, lettering style and fashion and at such places as Franchisor may designate in its Confidential Operating Manual” (§ 19.41; emphasis added). For these reasons, plaintiff’s allegation as to its use of the Union Carbide trademark and service marks is sufficient to withstand the instant motion to dismiss.
Defendants next contend that to the extent plaintiff seeks to recover under the Franchise Act for defendants’ alleged concealment of a preexisting plan to dispose of the franchise system, it is barred. Defendants assert that the sole basis for this allegation is an internal business proposal authored by certain UCMC personnel and utilized by them to prompt UCC&P to establish and fund UCMC. This is insufficient to constitute an actionable claim under the Franchise Act. Defendants also deny the existence of such a plan.
*950 The documentary evidence is to the contrary. A draft of UCC&P’s business plan explicitly states "[s]impie, low risk bail-out contingency if checkpoints not met.” The final version states "[a]t major check points, a venture evaluation would occur to control exposure and risk.” This evidence supports plaintiffs allegation of the existence of a preexisting business plan to dispose of the franchise system if certain checkpoints were not met sufficient to withstand the instant motion to dismiss.
Defendants also contend that that portion of the complaint alleging a violation of section 691 (3) of the New York Franchise Sales Act by the individual defendants, UCC&P and Union Carbide must be dismissed on the ground that plaintiff failed to allege sufficient facts showing that such individual defendants, UCC&P and Union Carbide "materially aid[ed]” in the alleged transactions constituting the violations, as required under the Franchise Act.[4] Section 691 (3) provides: "A person who directly or indirectly controls a person liable under this article, a partner in a firm so liable, a principal executive officer or director of a corporation so liable, a person occupying a similar status or performing similar functions, and an employee of a person so liable, who materially aids in the act or transaction constituting the violation, is also liable jointly and severally with and to the same extent as the controlled person, partnership, corporation or employer” (emphasis added).
Defendants contend that the foregoing provision should be construed to mean that prior to the imposition of liability therein, a controlling person, a partner, a principal executive officer or director of a corporation, or persons occupying a similar status, or an employee thereof, all must have "materially aided” in the acts constituting the alleged violation before liability under section 691 (3) will result. In short, defendants contend that the phrase "materially aids” modifies all of the categories of persons preceding that phrase.
In contrast, plaintiff contends that this section should be construed to impose presumptive liability on all persons so enumerated, as well as on an employee who has "materially aided” in the acts constituting the alleged violation. Plaintiff claims that its interpretation of section 691 (3) is logical because it shields from liability innocent employees, such as *951 mailroom clerks, secretaries and so forth. Thus, plaintiff contends that the phrase "materially aids” modifies only the category of persons immediately preceding such phrase: the employee.[5]
Since the New York Franchise Sales Act was enacted specifically to prevent, combat and protect the franchisee from rampant franchise sales fraud, it is remedial in nature, and therefore, to be liberally construed (see, McKinney’s Cons Laws of NY, Book 1, Statutes § 341). In the interpretative context, courts are obliged to "harmonize the various provisions” of a statute to achieve its legislative purpose (Sanders v Winship, 57 NY2d 391 [1982]; Anglin v Anglin, 80 NY2d 553 [1992]), and thus, must read the entire law and accord respect to the interlocking and interrelated features of all its parts (Anglin v Anglin, supra, 80 NY2d, at 557; Matter of Aaron J., 80 NY2d 402 [1992]; Statutes, op. cit., § 98).
A plain reading of the statute demonstrates that the phrase "materially aids” modifies the term "[a] person who directly or indirectly controls,” i.e., a controlling person. This interpretation is consistent with the express terms of the statute. At the outset, it is clear that the other categories enumerated in the statute were meant to be separate and distinct from the category of "[a] person who directly or indirectly controls a person liable under [the Act]”; this is made clear by the fact that the other categories: a partner, a principal executive officer or director, a person occupying a similar status, and an employee of such person, all are followed by the phrase "so liable.” Following the enumeration of these categories, the phrase "materially aids” then is inserted. The court finds that the phrase "materially aids” logically modifies "[a] person who directly or indirectly controls.”
Furthermore, this construction finds support in the second part of the sentence. The control person is made jointly and severally liable with and to the same extent as "the controlled person, partnership, corporation or employer.” This enumeration of categories tracks the enumeration of persons in the first part of the sentence. This was not a coincidence and indicates that the phrase "materially aids” was meant to modify "[a] person who directly or indirectly controls.”
The foregoing construction also is in keeping with the legislative purpose of the Franchise Act. Section 680 states, in pertinent part:
*952 "1. The legislature hereby finds and declares that the widespread sale of franchises [has caused] New York residents [to] suffer[ ] substantial losses where the franchisor * * * has not provided full and complete information * * *
"2. It is hereby determined and declared that the offer and sale of franchises * * * is a matter affected with a public interest and subject to the supervision of the state, for the purpose of providing prospective franchisees and potential franchise investors with material details of the franchise offering so that they may participate in the franchise system in a manner that may avoid detriment to the public interest and benefit the commerce and industry of the state. Further, it is the intent of this law to prohibit the sale of franchises where such sale would lead to fraud or a likelihood that the franchisor’s promises would not be fulfilled” (emphasis added).
Moreover, the foregoing construction is in keeping with the broad parameters of the Franchise Act. For example, a "person” under the Act is broadly defined as: "an individual, corporation, partnership, joint venture, association, company, trust, unincorporated organization or other entity and shall include any other person that has a substantial interest in or effectively controls such person, as well as the individual officers, directors, general partners, trustees, or other individuals in control of the activities of each such person.” (§ 681 [13].)
Similarly, the prosecution of suspected violators of the Franchise Act is under the auspices of the Department of Law, which is imbued with broad powers, including injunctive powers, to: "bring an action in the name and on behalf of the people of the state of New York against such person and any other person theretofore concerned in or in any way participating in such unlawful or fraudulent practice, to enjoin such person or persons from continuing such unlawful and fraudulent practice * * * [I]f the department should believe from such evidence that such person actually has or is engaged in any such unlawful or fraudulent practice, it may include in such action an application to enjoin permanently such person and such other person as may have been or may be concerned with or in any way participating in such unlawful or fraudulent practice” (§ 689 [1]; emphasis added).
In short, the express terms of section 691 (3) itself, as well as the legislative policy and the broad parameters of the other provisions of the Franchise Act, support the interpretation *953 that the phrase "materially aids” modifies "[a] person who directly or indirectly controls another person liable under [the Act].” Consequently, plaintiff need not allege the individual defendants, UCC&P and Union Carbide "materially aid[ed]” in the alleged transactions constituting the violations under section 691 (3) to withstand defendants’ motion to dismiss.[6]
Accordingly, defendants’ motion to dismiss those portions of the complaint alleging violations of the New York Franchise Sales Act is denied.
[Portions of opinion omitted for purposes of publication.]

. UCMC is now a largely dormant corporation.

. Research indicates that resolution of this issue under the New York Franchise Sales Act has never been adjudicated by any court in the State of New York.

. The court has considered defendants’ citation to non-New York cases and finds them not to be dispositive in this New York Franchise Sales Act action in light of the express terms of the Franchise Act itself and the strong public policy underlying the enactment of the Act.

. The complaint alleges that UCC&P owns 92% of the stock of UCMC and that Union Carbide owns shares of stock in its subsidiary, UCC&P.

. Interpretation of section 691 (3) appears to be one of first impression.

. The parties agree that since individual defendants Freeman and Lutjen did not join UCMC until 1991, i.e., after plaintiff acquired its UCMC franchises, and the Franchise Act only protects prospective franchises, no statutory claim against such defendants may be stated. Therefore, defendants’ motion to dismiss that portion of the first cause of action seeking to impose liability on Freeman and Lutjen is granted.